IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : Case No. 1:22-CR-219-004 |
| | : |
| SKY LAWSON, | : |
| | : |
| Defendant. | : |

**SENTENCING MEMORANDUM ON BEHALF OF SKY LAWSON**

Defendant Sky Lawson ("Ms. Lawson") submits this sentencing memorandum in support of her request for a sentence of 24 months' imprisonment. Although her conduct is indeed serious, it represents the only legal transgression Ms. Lawson has ever committed.

Ms. Lawson has learned valuable life lessons from this incident, and she will never repeat the actions that bring her before the Court in this case. For the reasons set forth in greater detail below, we request a sentence of 24 months' imprisonment because we believe it to be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Ms. Lawson has pled guilty and admitted her violation. Her sentencing guideline range is 33 months to 41 months as calculated by the probation officer. However, this is a case where the guidelines themselves should be discarded since they fail to take into account Ms. Lawson's unique personal attributes. In fact, the defense argues that under all of the 18 U.S.C. 1335(a) factors, a sentence of 24 months' imprisonment would be appropriate in this case.

**I.    FACTUAL BACKGROUND**

Ms. Lawson was a law-abiding citizen before the instant offense. Her life was characterized by hard work, dedication, and love for her family and friends. Indeed, it was the

love for her friends which ultimately caused her to become involved in the instant offense.

Ms. Lawson resides with her parents in Upper Marlboro, Maryland. Her life is centered around her family, whom she loves and cares for very deeply, and her work with animals at the APAW Veterinary Hospital and Wellness Center in New Carrollton, Maryland. The letters appended hereto from her family members and friends show that she has touched their lives very deeply. *See* Exhibit "A".

### A. Sky Lawson's Family Background

Ms. Lawson was born on June 7, 1994, in Bowie, Maryland. PSR ¶ 42. She is one of two children born to Michelle Haywood and Christopher Lawson. *Ibid.* Ms. Lawon grew up in a very peaceful and protective environment. *Id.* at 21. She has always been very close with both her parents and her brother, Jet Lawson, who resides in Bowie, Maryland, and works at an automotive shop, *see* PSR ¶ 46.

Ms. Lawson has never married and has no children. *Id.* ¶ 47. She was, however, in a committed relationship with Christopher Canales who tragically passed away in 2015 after suffering a severe asthma attack. *Id.*, ¶ 56. His death was sudden and devastated Ms. Lawson, who believed that Mr. Canales would be the man she would spend the rest of her life with. Co-Defendant, Michael Makoge, was a close friend of Mr. Canales. The death of Mr. Canales and the grief Mr. Makoge and Ms. Lawson shared deepened their friendship, and Ms. Lawson came to view Mr. Makoge like a big brother whom she trusted inherently.

### B. Sky Lawson's Educational and Professional Background

Ms. Lawson was homeschooled by her mother through seventh grade. *Id.*, ¶ 43. Afterwards, she attended Bowie High School and graduated in 2012. *Id.*, ¶ 67. Since December 2024, Ms. Lawson has attended Prince George's County Community College with a focus on

2

business. *Id*., ¶ 65. She is currently in her last semester. *Ibid*.

Since November 2021, Ms. Lawson has worked for APWA Veterinary Hospital and Wellness Center in New Carrollton, Maryland. *Id*., ¶ 69. She was employed as a veterinary technician. *Ibid*. However, in 2024, Ms. Lawson sustained serious injuries to her hand as the result of a dog attack at work. *Ibid*. Since then, Ms. Lawson has primarily worked at the front desk. *Ibid*. Notably, after the attack, Ms. Lawson insisted that no report should be made because Ms. Lawson feared that the dog would be euthanized, and she knew how much the owner loved their dog. Ms. Lawson's love for animals is further exemplified by the way she has cared for her two dogs, Boo and Esko. Boo is a black labrador whom Ms. Lawson had for 12 years, and Esko is a 2-year old French bulldog.

    **C.**    **Ms. Lawson's Arrest**

In July 2022, Ms. Lawson was arrested for the present offense. Ms. Lawson was charged with conspiracy to commit wire fraud and aggravated identity theft. Ms. Lawson pled guilty, agreed with the description of the offenses outlined in the plea memorandum and acknowledged her role in the instant offense.

Ms. Lawson accepts responsibility for her wrongdoing and is sincerely remorseful for her conduct. She is committed to facing the consequences of her actions and rebuilding her life after making a big mistake. She is deeply sorry for her actions and looks forward to expressing remorse at the upcoming hearing.

    **D.**    **Sky Lawson is a Pillar in her Community**

Ms. Lawson has received multiple letters from family and friends describing her as a devoted and helpful daughter, sister, and friend. *See* <u>Exhibit "A"</u>.

Ms. Lawson's mother, Michelle Haywood, describes Ms. Lawson's generosity and

kindness. *Id*. at 1. Ms. Lawson "volunteer[ed] hundreds of hours of community service" and "[e]ven on her job, she volunteers to work on holidays to spare her colleagues." *Ibid*. Ms. Lawson "was the one to deliver toys to families on Christmas Eve when volunteers couldn't". *Ibid*. Ms. Haywood further reflects on the recent tragic accident Ms. Lawson was involved in at work. *Ibid*. Ms. Lawson "was attacked on her neck and hand, dragged by an unmuzzled 116 pound Dogo Argentino while doing her job as a Veterinary Technician. Traumatized, bleeding, in excruciating pain in the hospital bed, [Ms. Lawson] cried to me", Ms. Haywood recalls. *Ibid*. "She expressed, in that moment as we worried about saving her right hand, that she did not want the dog put down because of her. 'He (the owner) loves that dog!' she cried. She didn't want the dog owner to feel bad or be sued. Nor did she want her employer to be put at a disadvantage from the incident." *Ibid*. Finally, Ms. Haywood describes how the instant offense changed Ms. Lawson's life. Ms. Lawson "changed her circles" and she changed her "focus in life". *Ibid*. "[H]er regrettable move" was the "turning point that catapulted [Ms. Lawson's] growth to responsible adulthood". *Ibid*. Further attached to Ms. Haywood's letter is a document which she created, and which reflects the history of Ms. Lawson's family and upbringing. *See id*., at 3-11.

    Ismael Vincent Canales, a friend and the former President of the Maryland State Fraternal Order of Police, has known Ms. Lawson for 15 years. His son was Ms. Lawson's boyfriend who tragically passed away in 2015. Mr. Canales recalls how his son "ranted about finding the love of his life" when he met Ms. Lawson. *Id*. at 12. He understood why when he met Ms. Lawson himself. "She was kind, delightful, funny, charming, intelligent, and cultured. The type of young lady you hope your son brings home to meet the family". *Ibid*. Despite Mr. Canales' son's passing, Ms. Lawson "remains to this day a part of [Mr. Canales'] family". *Ibid*. Mr. Canales further observed Ms. Lawson to be "an upstanding, lovely young lady who volunteers a lot of her

4

time and wants to see only the best in people and the world". *Ibid*. After talking with Ms. Lawson and realizing "that [Ms. Lawson] recognizes and regrets the pain [her actions ha[ve] caused, Mr. Canales is "wholeheartedly convinced that there's no chance of her ever being mixed up with or on the wrong side of the law after this episode". *Ibid*.

Former County Executive for Prince George's County and family friend, Rushern Baker III also provided a letter for Ms. Lawson. He states that he has known Ms. Lawson for 20 years and that Ms. Lawson was one of his "youngest and most dedicated volunteers" when he "first ran for County Executive in 2002". *Id*. at 13. He describes how she "encouraged other young people to engage in public service" and how she "worked tirelessly on projects that benefited the most vulnerable members of our community—organizing toy drives, distributing food to families in need, rehabilitating shelters, and leading environmental clean-ups. These efforts were not merely acts of obligation; they were a reflection of her compassionate heart and strong moral character". *Ibid*. Mr. Baker further states that Ms. Lawson "has expressed deep remorse to [him] personally, and understands the seriousness of her choices". *Ibid*. Mr. Baker has "no doubt that she will use this experience as a catalyst for growth, striving to make amends and continue serving her community in meaningful ways". *Ibid*. Ms. Lawson "is not someone who takes this moment lightly, and [Mr. Baker] believe[s] she has the potential to emerge from this experience as an even stronger and more responsible member of society". *Ibid*.

Karen Farmer, a family friend and retired Probation and Parole Officer with the Court Services and Offender Supervision Agency for the District of Columbia states that she has known Ms. Lawson since her birth as a life-long friend of Ms. Lawson's mother. *Id*. at 15. Ms. Farmer has "volunteered alongside [Ms. Lawson] many times over the years". *Ibid*. Ms. Lawson "is a delightful, generous and honorable young lady with a spirit for helping others". *Ibid*. From

5

Ms. Farmer's "personal and professional experience, [she] strongly believe[s] [Ms. Lawson's] poor decision stemmed from her inability to exercise good judgment during a young and developing stage of her life". *Ibid*. She believes "that was coupled with some gullibility when facing a high-risk situation, as well as the inherent pressures of being lured by a close and trusted male friend". *Ibid*. Ms. Farmer concludes her letter with the following:

> As a Community Supervision Officer, I've felt the pleasures of observing individuals thrive and turn the page from lenient sentences. I've also felt that dismay when others squandered that golden opportunity. With the benefit of knowing Sky personally, it is my professional belief that Sky is the individual who will take full advantage of every opportunity given to her in the event of lenient sentencing. Sky would present as a model candidate and success story. A young woman immediately returning to the life expected of her. Her recent strives for academic success alone, hint at the woman she truly is. Sky promises to be one of those cases that would forever remind us criminal justice practitioners of why we continue to believe in redemption.

*Ibid*. Furthermore, additional letters are included within Exhibit A from Ms. Lawson's father, Chris Lawson, her brother, Jet Lawson, her aunt Yvonne Haywood, her friends, Chyna Murry, Kelsey Garibaldi, Noddra Gray, and Reginald Staton, and her employer, Dr. Patricia Peynado-Boyce who all agree that Ms. Lawson is a wonderful person who deserves a second chance. *Id*., at 17-30.

## II.    ADVISORY GUIDELINE RANGE

The Probation Officer has calculated an advisory guideline range of 33 months to 41 months, resulting from a total offense level of 20 and Criminal History Category I.  The guideline range offers no useful advice because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) fails to take any account of Ms. Lawson's culpability or low risk of recidivism; (3) would result in unwarranted disparity as

6

compared with sentences for similarly situated Defendants; and (4) is far greater than necessary to promote the goals of sentencing in this case. The government apparently recognizes this fact and has agreed to recommend a sentence of 24 months, the mandatory minimum in the case.

Furthermore, the guideline range, is only one of the factors the Court must consider under 18 U.S.C. 3553(a).

**III.     A SENTENCE OF 24 MONTHS' IMPRISONMENT WOULD BEST SATISFY THE GOALS OF §3553(a).**

The Court must " impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed

- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- (B) to afford adequate deterrence to criminal conduct;
- (C) to protect the public from further crimes of the defendant; and
- (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

No workable guideline could ever "account for many of the myriad factors that are properly considered in fashioning just sentences." *See United States v. Ovid, slip op.*, 2010 WL 3940724, *1 (E.D.N.Y. 2010). A departure is needed in this case because of the following

7

mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

      A.      **The Guidelines are not Based on Empirical Evidence or National Experience and Fail to Promote any Purpose of Sentencing.**

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that assure the meeting of the purposes of sentencing, 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point". 28 U.S.C. § 994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*,17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be fair to assume that the guidelines reflect a rough approximation of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline

8

interactors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role, because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." *Id*. at 109-10.

The guideline regarding offenses involving aggravated identity theft is not based on empirical data of past practice or on national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending USSG § 2Xl.1 and § 2B 1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

The United States Sentencing Guidelines have faced criticism for their shortcomings in accurately determining the length of sentences. One primary concern is that the guidelines often rely heavily on factors such as the severity of the offense and the defendant's criminal history, without adequately considering individual circumstances and potential for rehabilitation. This one-size-fits-all approach may result in disproportionately harsh sentences that fail to account for mitigating factors or the potential for an offender's successful reintegration into society. *See* Amy Baron-Evans & Jennifer Coffin, *Judges are free to disagree with any guideline, not just crack*, 2-9 (Nov. 7, 2011). Furthermore, the rigidity of the guidelines limits judicial discretion and prevents judges from tailoring sentences to fit the unique circumstances of each case. *Ibid*.

This inflexibility may lead to sentencing outcomes that do not align with the goals of deterrence, rehabilitation, or proportionality. Additionally, the guidelines have been criticized for perpetuating racial and socioeconomic disparities in the criminal justice system, as they may disproportionately affect marginalized communities. *See* George Coppolo, *Criticism of Federal Sentencing Guidelines*, THE CONNECTICUT GENERAL ASSEMBLY, (July 6, 1994). Overall, these concerns highlight the limitations of the United States Sentencing Guidelines in accurately determining the appropriate length of sentences and the need for a more nuanced and individualized approach to sentencing.

### B. Need for Just Punishment in Light of Seriousness of the Offense.

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?,* 89 Minn. L. Rev. 571, 590 (February 2005). The guidelines include none of the factors bearing on Ms. Lawson's degree of culpability.

### 1. Sky Lawson's Conduct was Aberrant.

Ms. Lawson generally lived a law-abiding life until the instant offense began. Her is offense is completely uncharacteristic when viewed in the context of her entire productive adult life. This Court must consider the aberrant nature of her conduct. *See, e.g., United States v. Howe*, 543 D.3d 128, 132 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life; *see also United States v. Hadash*, 408 F.3d 1080, 1084 (8th

Cir. 2005) (Defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 232920 (S.D.N.Y. 2008) (Defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

  **C.**  **Need for Deterrence.**

  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels ... reached that conclusion, as has every major survey of evidence." *Ibid.*; *see also* Zvi D. Gabbay, Exp*loring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447048 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity").

  Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, *et al*., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*., at 1. It examined the effects of changes to both the certainty and severity of punishment. *Ibid*. While significant correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1.

  According to "the best available evidence, ... prisons do not reduce recidivism more than

11

noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

### D.     Need for Incapacitation.

Ms. Lawson has an exceptionally low risk of recidivism.

Furthermore, Ms. Lawson has shown that while released on bail she has demonstrated no intention of engaging in any further criminal conduct. She has met all terms of bail and has continued to be a productive member of society.

Ms. Lawson is a first offender and was employed throughout her adult life.  For all female offenders in Criminal History Category I, the recidivism rate is 10%. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*. For those who have been employed, the rate is 12.7%. *Ibid*. Finally, offenders like Ms. Lawson with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, Recidivism and the "First Offender," at 13-14 (May 2004) [hereinafter First Offender].

The Commission has recognized the advisability of revising the guidelines to take first offender status into account. *See* First Offender, at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure").

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Ms. Lawson, this Court should consider the statistically low risk of recidivism presented by Ms. Lawson's history and characteristics. *See*, e.g., *United States v. Darway*, 255 Fed. Appx.  68, 73 (6th Cir. 2007) (upholding downward variance on a basis of Defendant's first-offender status); *United States v. Urbina*, slip op., 2-0 WL 565485, *3 (E.D. Wis. 2009) (considering low risk of recidivism indicated by Defendant's lack of criminal record, positive

work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because Defendants "with zero criminal history points are less likely to recidivate than all other offenders").

### E. Need to Avoid Unwarranted Disparities and Unwarranted Similarities.

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, see *Gall*, 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two Defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the Defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

The chart below includes sentences of Ms. Lawson's co-defendants who have also been convicted of similar offenses and where Ms. Lawson's co-defendants received sentences substantially below the guideline ranges applicable in those cases and commensurate with their respective conduct. Notably, there is a significant disparity between Ms. Lawson's conduct and the conduct of her co-defendants. The conduct of each of Ms. Lawson's co-defendants was much worse than Ms. Lawson's conduct. Ms. Lawson's primary involvement in this case was the use of her mailing address for unemployment insurance benefits applications and mailings. However, relative to Ms. Lawson's co-defendants, her conduct is most similar to that of Aiyanna Mone Washington. The defense and the government both request this same sentence for Ms. Lawson.

13

| Co-Defendant | Conviction | Sentence Imposed |
|---|---|---|
| Aiyanna Mone Washington | 18 U.S.C. §§ 1349, 1343, 1028A(a)(1), (c)(5) | 24 months' imprisonment<br>2 years' supervised release<br>Restitution of $2,094,319.00 |
| Christian Malik Adrea | 18 U.S.C. §§ 1349, 1343, 1028A(a)(1), (c)(5) | 36 months' imprisonment<br>3 years' supervised release<br>Restitution of $2,094,319.00 |
| Michael Akame Ngwese Ay Makoge | 18 U.S.C. §§ 1349, 1343, 1028A(a)(1), (c)(5) | 53 months' imprisonment<br>3 years' supervised release<br>Restitution of $2,094,319.00 |
| Stephawn Malik Watson | 18 U.S.C. §§ 1349, 1343, 1028A(a)(1), (c)(5) | 53 months' imprisonment<br>3 years' supervised release<br>Restitution of $2,094,319.00 |
| Dementrious Von Smith | 18 U.S.C. §§ 1349, 1343, 1028A(a)(1), (c)(5) | 53 months' imprisonment<br>3 years' supervised release<br>Restitution of $2,094,319.00 |
| Christopher Thomas Yancey | 18 U.S.C. §§ 1349, 1343, 1028A(a)(1), (c)(5) | 63 months' imprisonment<br>3 years' supervised release<br>Restitution of $2,094,319.00 |

### F.    Kinds of Sentences Available.

This Court must consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence ... established [by] the guidelines" zones recommend only a lengthy prison term. *See Gall*, 552 U.S. at 59 & n.11. According to the Supreme Court's decisions in *Gall* and *Kimbrough*, federal judges are free to consider relevant circumstances related to an offense and the history and characteristics of a defendant, and are not tied to the rigid, arithmetic framework of the Guidelines. Indeed, *Kimbrough* and *Gall* have returned

sentencing courts to the "federal judicial tradition" of considering "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Gall*, 552 U.S. at 52; *see also United States v. Tornko*, 562 F.3d 558, 560 (3d Cir. 2009) ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.").

Ultimately, the Court must "impose a sentence sufficient, but not greater than necessary" to comport with the goals of sentencing. *See United States v. Ollzovsky*, 562 F.3d 530, 552 (3d Cir. 2009). Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 9940).

Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Ms. Lawson is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society".

IV.    CONCLUSION

At the time of Ms. Lawson's sentencing, this Court will be charged with imposing a sentence that is fair, but not "greater than necessary." 18 U.S.C. § 18553(a); *Kimbrough*, 552

U.S. at 101. This bedrock principle of sentencing law cannot be fulfilled in Ms. Lawson's case if she is sentenced at or near the range proposed by the Guidelines. Rather, as reflected by the data and analogous case law above, a sentence of 24 months' imprisonment is more appropriate in this case.

Ms. Lawson is a good person who is profoundly sorry for her transgressions. She has learned from her mistake and accepted full responsibility for her actions. She has no criminal history and is extremely unlikely to recidivate in this manner again. Furthermore, Ms. Lawson has shown while on probation she has no intention of engaging in similar criminal conduct. Ms. Lawson plans to address the Court at her upcoming sentencing hearing to express her sincere remorse once again, and to assure the Court that she will never again break the law.

Date: April 18, 2025                              Respectfully Submitted,


*/s/ Dennis E. Boyle*
Dennis E. Boyle, Esquire
Boyle & Jasari
1050 Connecticut Ave, NW
Suite 500
Washington, D.C., 20036
Email: dboyle@boylejasari.com

Phone: (202) 430-1900

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

      I hereby certify that on this 18th day of April 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing to all counsel of record.

                                                */s/ Dennis E. Boyle*
                                                Dennis E. Boyle, Esquire